FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA 99 MAY 27  AM 10· 29
SOUTHERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| CYNTHIA R. UMOEKA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CV-97-BU-2035-S |
| | ) |
| HEALTHSOUTH MEDICAL CENTER, | ) |
| | ) |
| Defendant. | ) |

ENTERED

MAY 27 1999

## MEMORANDUM OPINION

This case is presently pending before this Court on Motion for Summary Judgment,

filed by the Defendant HealthSouth Medical Center [hereinafter "HealthSouth"](Doc. 53).

Plaintiff Cynthia R. Umoeka sued HealthSouth, her former employer, alleging she was

disciplined and discharged on the basis of color, in violation of Title VII (42 U.S.C. § 2000e-

2(a)(1). This Court has reviewed the record and determined that HealthSouth's Motion for

Summary Judgment is due to be granted and this case dismissed.

## SUMMARY JUDGMENT STANDARD

Summary judgment provides the parties an opportunity to test the mettle of a case

before it ever reaches trial. On a motion for summary judgment, the court assesses all of

the proof the parties bring to bear in order to ascertain whether there is a genuine need for

a trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct.

1348, 1356, 89 L. Ed. 2d 538 (1986)(quoting Advisory Committee Note to 1963 Amendment to Fed. R. Civ. P. 56(e)). Summary judgment is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

A party seeking summary judgment has the initial responsibility of informing the court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party's burden is not meager; it must illuminate for the court the reasons why the non-moving party cannot or does not raise a genuine issue of material fact sufficient to support a trial. *Clark*, 929 F.2d at 608. The moving party's burden was set forth in *Clark* as follows:

> The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. *Celotex* did not change the general rule. *Celotex* simply holds that under certain circumstances the movant may meet its Rule 56 burden without negating an element of the non-moving party's claim and that under such circumstances it is sufficient to point to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden. Even after *Celotex* it is never enough to simply state that the non-moving party cannot meet its burden at trial.

*Id.* (citing *Celotex*, 477 U.S. at 323-25, 106 S. Ct. 2553-54).[1]

Once the moving party has satisfied this initial burden, however, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(e)); *see Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). However, "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Id.*; *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), *cert. denied sub nom. Jones v. Resolution Trust Corp.*, 516 U.S. 817, 116 S. Ct. 74, 133 L. Ed. 2d 33 (1995).

---

[1]The Eleventh Circuit recognized that *Celotex* created "an exception to the *Adickes* [*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)] rule for [an] uncommon situation," i.e., "when neither party could prove either the affirmative or the negative of an essential element of the claim." *Clark*, 929 F.2d at 607, 608. In this "uncommon situation," the *Celotex* exception allows a moving party to carry its burden by showing or "pointing out," by reference to record, that the non-moving party cannot prove its claim. *Id.* at 607.

In resolving whether a given factual dispute requires submission to a jury, the court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. *Anderson*, 477 U.S. at 254-55, 106 S. Ct. at 513. The court, however, must not weigh conflicting evidence for probity or make credibility determinations. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather determine whether such issues exist to be tried. The court must avoid weighing conflicting evidence or making credibility determinations." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993)(citations omitted). "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *EPL, Inc. v. USA Federal Credit Union*, ___ F.3d ___, 1999 WL 252383, slip op. at *4 (11th Cir. Apr. 29, 1999)(quoting *Clemons v. Dougherty County, Ga.*, 684 F.2d 1365, 1369 (11th Cir. 1982). At the same time, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" *Tidwell v. Carter Products*, 135 F.3d 1422, 1425 (11th Cir. 1998) (quoting *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)).

## STATEMENT OF FACTS[2]

HealthSouth employed Ms. Umoeka, a dark-skinned black female, as a Nuclear Medicine Technologist in September 1986. Nuclear Medicine Technologists inject patients with a radioactive compound and then take pictures of different areas of the body, as per the physician's instructions, using a special camera.

Ms. Umoeka performed these job duties in the Nuclear Medicine Department at HealthSouth. Patients would come to the department for procedures, either as out-patients or in-patients. Technologists were required to check the images before releasing the patient, and, if the image was unclear, the procedure could be repeated before the patient left the Department.

The technologists, including Ms. Umoeka, worked regular weekday hours and rotated on-call for emergency, after-hours procedures. HealthSouth provided technologists with beepers, which were used to contact employees on call. Contacting an on-call employee to return to the hospital is referred to by the parties as "call back." HealthSouth's procedures concerning call backs required employees to "respond within 15 minutes of the initial beep or call" requiring the employee to return to the hospital and employees must "arrive in the department within 30 minutes of response." Def. Exh. 2, Exh. 18.

___

[2]As required when determining a Motion for Summary Judgment, the Statement of Facts reflects the facts in the light most favorable to Ms. Umoeka, the non-moving party. All disputed facts are resolved in her favor and all reasonable inferences arising from those facts are drawn in her favor. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89, 110 S. Ct. 3177, 3188-89, 111 L. Ed. 2d 695 (1990); *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1455 (11th Cir. 1997).

In 1991, Douglas Lamon, Nuclear Medicine Department Manager, became Ms. Umoeka's supervisor. In addition to Ms. Umoeka, he supervised one other technologist, Pat Autry. Ms. Autry resigned in 1993 and HealthSouth hired Johnita Marsh-Dobbs to replace her. Ms. Marsh-Dobbs is a light-skinned black female.

HealthSouth contends that Ms. Umoeka's job performance began to decline during the latter half of 1995. Prior to November 1995, Ms. Umoeka had never received a written reprimand. In an affidavit attached to her EEOC charge, Ms Umoeka states that her disparate treatment began when she returned from maternity leave. Pl. Exh. 1.

On November 15, 1995, Mr. Lamon had a verbal counseling conference with Ms. Umoeka, documented on a HealthSouth form entitled "Anecdotal Record," the subject of which was "quality of work" and "tardiness." The incidents prompting the conference were set forth as follows:

> Chief Radiologist states incidents of unacceptable work quality. State a limited bone scan where area of interest not included, a thyroid scan where thyroid not visible, an [emergency room patient] complaint where technologist said, "It wasn't convenient for her" to inject in other arm after several attempts on other, and a "To Go" bone scan where area of interest excluded, and then told to do two more images, did only one. Orthopedic physician complained because [patient] late to office. Also 2 tardies (11/6 & 7) in excess of 1 [hour].

Def. Exh. 2, Exh. 15. Ms. Umoeka, in the space provided for an employee's comments, stated:

> In response to the patient complaint my comment was that the right arm was a little more convenient as far as spatial and technical allowances. It was quite obvious that the patient was not feeling well upon my entering the room. I could have relaxed the patient more as well as rearranged table and equipment. Tardiness on 11/7 was due to severe weather conditions/driving ability. 11/5 arrived at 7:35, no time card found. . . . Thyroid scan -- failed

Page 6 of 24

to adjust intensity on formatter. Bone scan -- imaged area of patient complaint .... Aware of concerns and remedies required – Apologize to all affected -- Appreciative of patience/forbearance ....

*Id.*

A couple of days later an addendum was added to the anecdotal record, which stated that the events recorded in the anecdotal record occurred over eight or nine work weeks, as Ms. Umoeka had been off work on "FMLA leave." The addendum also stated that the emergency room patient had misunderstood Ms. Umoeka and that she had told the patient that it would be hard to inject into the left arm because of the camera position. Finally, the addendum noted that Ms. Umoeka had completed "numerous studies" in which the image was suitable or above average. *Id.*

On December 26, 1995, Ms. Marsh-Dobbs did not show up for work. Ms. Umoeka contends that Ms. Marsh-Dobbs did not call her and that she had an inordinate amount of procedures scheduled that day. However, Mr. Lamon stated that Ms. Marsh-Dobbs never missed work without contacting him, as he was her supervisor. Ms. Marsh-Dobbs was not written up for this incident. In fact, Ms. Marsh-Dobbs was never written up.

On March 11, 1996, Mr. Lamon issued Ms. Umoeka a written warning for "failure to comply with policy." Def. Exh. 2, Exh. 17. He described the incidents leading to the written warning as follows:

3-2-96 -- Callback on [patient] # 57127 for Hide scan. [Ms. Umoeka] called at 8:30, did not arrive until 10:06 a.m. [Patient] was waiting on Hide to determine if for [surgery] that day.

3-7-96 -- Did not show for shift or call or leave message. Limited ability to watch [patients] and perform needed duties. Had called on 3/6/96, but made no [statement] about 3/7/96.

Page 7 of 24

*Id.* Mr. Lamon noted that "further instances will result in disciplinary action and/or termination." *Id.*

Ms. Umoeka responded to this written warning by asserting that she believed the patient was scheduled for "other studies" and, therefore, would not be available. She also claimed that her request for sick leave on March 6th had included a request for leave on March 7th. *Id., see also* Def. Exh. 2, Exh. 19, p. 3 (Ms. Umoeka stated that she had requested sick leave for more than one day as she did not expect her "situation" would change by the next day.).

At the same time that she received the written warning, Mr. Lamon issued Ms. Umoeka a performance appraisal, giving her a rating of "1," which signifies her performance "is below an acceptable level." Def. Exh. 2, Exh. 19. It also meant that Ms. Umoeka was placed on "probation" for a period of 90 days. *Id.* HealthSouth, in its brief to this Court, states, "Mr. Lamon issued Plaintiff an appraisal in which he gave her an *overall* rating of '1.'" Def. Brief, p. 8 (emphasis added). However, far from indicating her "overall" job performance, the appraisal only evaluates Ms. Umoeka on "Productivity." Def. Exh. 2, Exh. 19. This Court, viewing the evidence in the light most favorable to Ms. Umoeka, finds that the form was no more than notice to Ms. Umoeka that she was on probation, but it declines to find that the appraisal form is evidence of her "overall" job performance.

On June 13, 1996, Ms. Umoeka received a second written warning for "quality of work" and "job performance." This warning states:

Page 8 of 24

5/24/96 -- failed to check images before [patients] left, 2 studies had to be reimaged ([patients] had to come back down. 6/10/96 -- Failed to call cardiologist's office to have out [patient] study read. [Patient] had [appointment] next day [and] referring physician was calling for report. Cardiologist had to make special trip over to read her study.

Def. Exh. 2, Exh. 20. On this anecdotal record, Ms. Umoeka did not dispute that she had failed to check the images before releasing the patients. Id. She did, however, state that she was not the first technologist who had failed to call the cardiologist. Id. In a hand-written memo, prepared the day she received the second written warning, Ms. Umoeka wrote that she "assumed" the her supervisor had communicated with the cardiologist. Def. Exh. 2, Exh. 21. However, in her deposition testimony, Ms. Umoeka stated that she had tried to contact the cardiologist, but his telephone line was busy. Def. Exh. 2, pp. 404-05. She also stated that she had taken his telephone number home with her, but she had not attempted to call him. Id.

The incident that prompted Ms. Umoeka's termination occurred on June 25, 1996. On that date, Ms. Umoeka had requested and received permission to leave work early. Shortly before leaving, Ms. Umoeka began a bone scan on a patient. The scan usually takes about 35-45 minutes to complete. Def. Exh. 2, p. 454. Ms. Marsh-Dobbs helped Ms. Umoeka get the patient's scan started. A nuclear medicine student was also present. Ms. Umoeka testified that she told Ms. Marsh-Dobbs, in the presence of the student, that she was leaving early and that Ms. Marsh-Dobbs would need to finish the procedure. Id. at 456; Def. Exh. 11. Ms. Umoeka spent about 15 minutes with the patient and then told Ms. Marsh-Dobbs that she was leaving. Def. Exh. 2, p. 455.

Page 9 of 24

The secretary for the Nuclear Medicine Department, Patricia Gleason, saw Ms.

Umoeka clock out. Def. Exh. 9, ¶ 5. Ms. Gleason then saw the patient on an examination

table and told Ms. Marsh-Dobbs, who then finished the patient's procedure. *Id.* ¶ 6, Def.

Exh. 4, Exh. B. Ms. Gleason told Mr. Lamon, who then investigated the incident by, among

other things, asking Ms. Umoeka, Ms. Marsh-Dobbs, and Ms. Gleason to prepare written

statements about the incident.

Ms. Marsh-Dobbs, in response to Mr. Lamon's request, prepared the following

statement:

> On 6-25-96, Cynthia Umoeka informed me that she was leaving and asked
> me where was [Mr. Lamon]. I told her that [Mr. Lamon] was next door in the
> other room. Then a little later Patricia Gleason told me that she saw Cynthia
> leaving and asked if I knew that the patient was still lying on the table. I told
> her "No" I did not know. I immediately went and got the patient up and
> processed the pictures. The patient was not harmed but she did ask, "why
> did it take so long." I responded by saying that we had to take some
> additional pictures. If Cynthia had told me to take over I would have but she
> did not communicate that to me. Therefore, the patient was left unattended.

*Id.* Exh. C. Ms. Marsh-Dobbs statement, written three days after the incident, did not

contain any reference to an earlier conversation with Ms. Umoeka concerning Ms.

Umoeka's request that Ms. Marsh-Dobbs finish the patient's procedure. Indeed, no

reference to such a statement appears in Ms. Umoeka's statement prepared in response

to Mr. Lamon's request.

In her statement prepared three days after the incident, Ms. Umoeka wrote:

> Re:     Incident of failing to fully communicate to coworker that exam was in
> progress. On 6/25/96 I failed to fully communicate to the other technologist
> that the bone scan of 45 minutes would be complete in an additional 15 to
> 20 minutes, Thankfully, the patient was in no distress, but lay an additional
> few minutes.

Although, a beeping signal is made upon exam completion it may not be heard always in the adjacent rooms by other technologist.

Full communication was not given by me. I made the assumption that the time factor was considered, since we both started the patient, but I remained 15 [minutes] into the exam and then informed the other tech that I had to leave. Otherwise, I had no reason to inform the tech of my departure . . . .

Def. Exh. 4, Exh. A, p. 2.

During his investigation, Ms. Umoeka never told Mr. Lamon that she had asked Ms. Marsh-Dobbs to handle the patient. Def. Exh. 4, ¶ 37. Based on the written statements and his personal knowledge of the incident, Mr. Lamon concluded that Ms. Umoeka "had left the patient unattended and had not informed anyone that she had not completed the patient's procedure." Id. ¶ 36.

Mr. Lamon reported the incident to Cindy Nolan, Director of Human Resources, and Lee Morrison, Director of Clinical Services and Mr. Lamon's supervisor. Mr. Lamon, Ms. Nolan, and Mr. Morrison reviewed Ms. Umoeka's disciplinary record and the results of Mr. Lamon's investigation of the June 25th incident. They agreed that Ms. Umoeka should be discharged "based solely on her leaving work with a patient's procedure incomplete and the patient on the examination table and Ms. Umoeka's disciplinary and preformance record." Def. Exh. 6, ¶ 10. Mr. Morrison stated that leaving a patient unattended was sufficient cause for termination. Id. ¶ 11. The decision to terminate Ms. Umoeka was reviewed and approved by Frank Gannon, HealthSouth Medical Center Administrator, and Dennis Wade, Vice-President of Human Resources.

Ms. Umoeka filed a charge of discrimination with the EEOC on July 17, 1996. HealthSouth contends that the EEOC made a finding that "HealthSouth terminated Plaintiff because she was 'unable to improve [her] performance and dependability after progressive discipline' and not 'because of [her] color of skin.'" Def. Undisputed Facts, p. 12-13. HealthSouth attributes this quote to its Exhibit 10, Donald P. Burris Certificate of Authority of EEOC Records, ¶¶ 1-8. However, Mr. Burris's "Certificate of Authority" merely states that the records "attached" are "true and correct copies" of the documents in the EEOC's file regarding Ms. Umoeka's charge of discrimination. The document does not contain the quote attributed thereto by HealthSouth; indeed, the exhibit contains no indication of the EEOC's consideration of the merits of Ms. Umoeka's claim.

Ms. Umoeka received her right-to-sue letter on or about May 4, 1997, and she filed this case on or about August 4, 1997. In her Complaint, filed pro se, Ms. Umoeka alleged four claims based upon discrimination on the basis of color: (1) discriminatory working conditions, (2) failure to reprimand, (3) failure to investigate, and (4) discriminatory discharge.[3]

---

[3]This Court has construed Ms. Umoeka's Complaint more liberally than it would the Complaint of a represented party. *Harris v. Ostrout*, 65 F.3d 912, 915 (11th Cir. 1995)(citing *Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S. Ct. 594, 596, 30 L. Ed. 2d 652 (1972); *Fernandez v. United States*, 941 F.2d 1488, 1491 (11th Cir. 1991).

## DISCUSSION

HealthSouth filed a Motion for Summary Judgment, seeking to dismiss all claims, on the grounds that (1) Ms. Umoeka was not the real party in interest because she had not listed this lawsuit as an asset in her bankruptcy case; (2) some of her claims are barred by the statute of limitations; and (3) there are no disputed issues of material fact and HealthSouth is entitled to judgment as a matter of law.

### A. BANKRUPTCY PROCEEDINGS

HealthSouth contends that it is entitled to a summary judgment because Ms. Umoeka did not list this cause of action as an asset in her bankruptcy case. However, since HealthSouth filed its Motion for Summary Judgment, the trustee in bankruptcy has abandoned this lawsuit as an asset. (Doc. 71) Therefore, HealthSouth's Motion for Summary Judgment on the basis of Ms. Umoeka's failure to list this cause of action in her bankruptcy case is due to be denied.

### B. DISCRIMINATORY DISCHARGE

This case is governed by the well-established *McDonnell-Douglas* framework for ordering proof in a circumstantial evidence case alleging employment discrimination.

Under this framework, the plaintiff must establish a prima facie case of discrimination. The establishment of a prima facie case creates a presumption of discrimination. The employer must then offer legitimate, nondiscriminatory reasons for the employment action to rebut the presumption. If the employer successfully rebuts the presumption, the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are pretextual.

*Standard v. A.B.E.L. Services*, 161 F.3d 1318, 1331 (11th Cir. 1998)(citing *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25, 36 L. Ed. 2d 668

(1973)); *see Schoenfeld v. Babbitt,* 168 F.3d 1257, 1267 (11th Cir. 1999).

    1.    PRIMA FACIE CASE

HealthSouth contends that Ms. Umoeka cannot prove her prima facie case because

she cannot show "that she was qualified for her position, [or] that HealthSouth disciplined

her more severely than a similarly situated employee who engaged in substantially the

same misconduct." Def. Brief, p. 10.

This Court notes that the Eleventh Circuit has long held that a plaintiff's qualification

for a previously-held job in a termination case is *not* an element of the prima facie case.

The Court has noted:

> "[T]he *McDonnell Douglas* test has been modified in cases where a plaintiff
> is discharged from a previously held position (as opposed to failure to hire
> or to promote cases)" by deleting the prong requiring proof of qualification.
> According to the [*Rosenfield v. Wellington*] court, "the reason for this
> modification is that in cases where a plaintiff has held a position for a
> significant period of time, qualification for that position *sufficient to satisfy the
> test of a prima facie case* can be inferred." *Whether the employee was
> adequately performing his job would become an issue only if the employee
> articulated unsatisfactory performance as the reason for discharge*.

*Young v. General Foods Corp.*, 840 F.2d 825, 830 n. 3 (11th Cir. 1988)(quoting *Rosenfield*

*v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987)), *cert.*

*denied*, 488 U.S. 1004, 109 S. Ct. 782, 102 L. Ed. 2d 774 (1989); *see also Pace v.*

*Southern Railway Systems*, 701 F.2d 1383, 1386 & n.7 (11th Cir. 1983)(citing *Simmons v.*

*McGuffey Nursing Home, Inc.*, 619 F.2d 369, 371 (5th Cir. 1980)(quoting *Marshall v. Westinghouse Electric Corp.*, 576 F.2d 588, 590 (5th Cir. 1978))), *cert. denied*, 464 U.S. 1018, 104 S. Ct. 549, 78 L. Ed. 2d 724 (1983).

Therefore, at least in this Circuit, qualification for the position held is not an element of a prima facie case when the decision at issue is termination. Whether Ms. Umoeka's job performance was unacceptable and disqualified her from her position with HealthSouth is better left to the second and third stages of the *McDonnell-Douglas* framework.

Also, Ms. Umoeka is not limited to establishing her prima facie case of discriminatory discharge by proof that similarly situated employees were treated more favorably. This Circuit has established at least three ways in which a plaintiff alleging discriminatory discharge due to a work-rule violation may establish a prima facie case: (1) the plaintiff "was fired and replaced by one outside the protected class;" (2) the plaintiff "was suspended or fired while others not in the plaintiff's protected class, having comparable or lesser qualifications, were retained;" or (3) the plaintiff was fired for misconduct and "the misconduct for which he was discharged was nearly identical to that engaged in by an employee outside the protected class whom the employer retained." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984)(internal citations and quotations omitted).

In its brief to this Court, HealthSouth states, "HealthSouth does not dispute that Plaintiff may establish that she is a member of a protected class, that HealthSouth discharged her, and that she was replaced by a person outside the protected class." Thus, Ms. Umoeka has established a prima facie case of discriminatory discharge under the first

manner of proof described in Nix. Because Ms. Umoeka has established a prima facie

case under the first manner described in Nix, it is unnecessary for the Court to determine

at this stage whether she can establish that she was treated less favorably than other

employees with regard to discipline, as described in the third manner of proof described

in Nix.[4]  However, this evidence is relevant to the determination of pretext, as discussed

below.

## 2.    ARTICULATED REASON

The second stage of a McDonnell-Douglas; circumstantial evidence case requires

the employer/defendant "to rebut the presumption of discrimination [created by proof of a

prima facie case of discrimination] by producing evidence that the plaintiff was [discharged]

for a legitimate, nondiscriminatory reason." Texas Department of Community Affairs v.

Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094, 67 L. Ed. 2d 207 (1981)(emphasis

added).   The employer's burden is a mere burden of production, not persuasion.

Standard, 161 F.3d at 1331 (11th Cir. 1998). To carry its burden, HealthSouth "need only

produce evidence that could allow a rational fact finder to conclude that [Ms. Umoeka's]

discharge was not made for a discriminatory reason." Id. (citing Combs v. Plantation

---

[4]HealthSouth contends that the Eleventh Circuit's decision in Jones v. Bessemer
Carraway Med. Ctr., 137 F.3d 1306 (11th Cir.), modified on other grounds, 151 F.3d
1321 (11th Cir. 1998), requires Ms. Umoeka to establish her prima facie case by proof of
a similarly situated employee who was treated more favorably. Def. Brief, p. 12. The
plaintiff in the Bessemer Carraway case was proceeding under the second manner of
proof set forth in the Nix decision. Nothing in Bessemer Carraway overrules the
express recognition of the Eleventh Circuit that a discriminatory discharge prima facie
case could be established with proof that the plaintiff's replacement was outside the
protected class, a fact that HealthSouth has admitted in this case.

*Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997), *cert. denied*, ___ U.S. ___, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998)).

HealthSouth has presented evidence that it discharged Ms. Umoeka for two reasons: (1) she left work early leaving a patient unattended and a procedure incomplete; and (2) her prior disciplinary record. This evidence is sufficient to rebut Ms. Umoeka's prima facie case.

3. EVIDENCE OF PRETEXT

HealthSouth's articulation of legitimate, nondiscriminatory reasons for Ms. Umoeka's discharge causes the presumption created by the prima facie case to drop from the case. *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 255 & n.10, 101 S. Ct. at 1094-95 & n.10).

The United States Court of Appeals for the Eleventh Circuit has held:

> When deciding a motion by the defendant for judgment as a matter of law in a discrimination case in which the defendant has proffered nondiscriminatory reasons for its actions, the district court's task is a highly focused one. The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct."

*Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)). The *Combs* Court also held that "[a] plaintiff in a discrimination case based on circumstantial evidence can avoid judgment as a matter of law by putting on a prima facie case and by producing evidence sufficient to discredit in the mind of a

reasonable juror *all* of the defendant's proffered nondiscriminatory reasons for its actions." *Id.* at 1543 (emphasis added).[5]

There are three basic ways a plaintiff may establish that her employer's proffered reasons are pretextual. "[A] plaintiff may discredit the employer's proffered legitimate reasons by showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employment decision, and (3) that they were insufficient to motivate the employment decision." *Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1564 (11th Cir. 1995)(Johnson, J., concurring).

The first reason offered for Ms. Umoeka's discharge is that she left work early on June 25, 1996, before completing a bone scan procedure, leaving a patient unattended on the examination table.   Ms. Umoeka contends that she did not leave the patient unattended, because Ms. Marsh-Dobbs was there.   Depending on the factual falsity of the proffered reason to establish pretext, however, can be "problematic." *Id.* A plaintiff may establish pretext by establishing that the articulated reason has no basis in fact only if she also can show that the decision-makers knew that the articulated reason had no basis in fact. "That the employee did not in fact engage in misconduct reported to the employer is irrelevant to the question of whether the employer *believed* the employee had done wrong." *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980 n.2 (11th Cir. 1989) (emphasis added), *cert. denied*, 495 U.S. 935, 110 S. Ct. 2180, 109 L. Ed. 2d 508 (1990).

---

[5]The *Combs* court reversed a jury verdict in favor of the plaintiff, finding that the plaintiff had submitted insufficient evidence of pretext as to only *one* of the three proffered reasons for his non-selection for promotion.

The evidence is undisputed that Ms. Umoeka left work early and that she left a patient before a procedure was complete. Ms. Umoeka disputes that she did not leave the patient *unattended*, because Ms. Marsh-Dobbs was there to finish the procedure. However, in a statement prepared at the request of Mr. Lamon at the time the incident occurred, Ms. Umoeka admitted that she did not give "full communication" to Ms. Marsh-Dobbs. She admitted that she had not told Ms. Marsh-Dobbs that she had a patient undergoing a bone scan procedure that would not be complete for 15 to 20 minutes, although she did state that she assumed Ms. Marsh-Dobbs knew that the procedure was not complete. Based on Ms. Umoeka's admission in her written statement to Mr. Lamon that she had not told Ms. Marsh-Dobbs that she was leaving and her patient's procedure was not complete and the complete lack of any evidence that Mr. Lamon or any other decision maker knew that Ms. Umoeka had not left without telling someone that her patient's procedure was not complete, this Court finds that Ms. Umoeka has failed to present sufficient evidence to allow a reasonable jury to find that HealthSouth did not terminate her because she left a patient unattended.

Ms. Umoeka contends that Mr. Lamon's investigation into the incident was inadequate because he did not question the nuclear medicine student on the scene at the time of this incident. She testified in an unemployment hearing, contrary to her contemporaneous written statement, that she had told Ms. Marsh-Dobbs, "I will get the patient started, and I will have to leave." Def. Exh. 11. She also testified that there was a student present at the time she made this statement to Ms. Marsh-Dobbs. *Id.* However, there is no evidence that Mr. Lamon or any other decisionmaker knew that Ms. Umoeka

had made such a statement or that the statement had been overheard by this unidentified student. In light of Ms. Umoeka's contemporaneous written admission that she had not told Ms. Marsh-Dobbs that the patient's procedure was incomplete at the time she left, Mr. Lamon's failure to interview this medical student is not sufficient evidence to show that the articulated reason for her discharge is pretext.

Therefore, because Ms. Umoeka has not presented sufficient evidence to allow a reasonable jury to find that HealthSouth's proffered reason for her discharge – that she left a patient unattended before a procedure was complete – was a pretext, HealthSouth's motion for summary judgment on Ms. Umoeka's termination claim is due to be granted. Because Ms. Umoeka has failed to discredit this articulated reason, it is unnecessary for this Court to address the additional reason for her discharge, her poor disciplinary record. See Combs, 106 F.3d at 1543.

## C.   DISPARATE DISCIPLINE

In addition to her discharge claim, Ms. Umoeka set forth the following claims in her complaint: (1) Discriminatory Working Conditions (Complaint, Doc. 5, ¶¶ 11-21); (2) Failure to Reprimand (Id. ¶¶ 22-38); and (3) Failure to Investigate (Id. ¶¶ 39-49). These three claims appear to be related to Ms. Umoeka's allegation that she was disciplined when another employee, Ms. Marsh-Dobbs, was not. Ms. Umoeka contends that Ms. Marsh-Dobbs is fair-skinned and she is dark-skinned and that the difference in treatment was based on color.

In order to establish a prima facie case of discrimination with regard to discipline, Ms. Umoeka must show that HealthSouth treated similarly situated employees of another

color more favorably. *Bessemer Carraway Medical Center*, 137 F.3d at 1310. With regard

to this element of the prima facie case, the Eleventh Circuit held:

> Evidence of similarly situated employees must be used to support Plaintiff's prima facie case. This aspect of Plaintiff's case is satisfied if:
>
> > [T]he plaintiff [shows] that [she] and the employees are similarly situated in all relevant respects . . . . In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.
>
> The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishment imposed. If Plaintiff fails to identify similarly situated, nonminority employees who were treated more favorably, her case must fail because the burden is on her to establish her prima facie case.

*Id*. at 1311 (internal quotations and citations omitted).

Ms. Umoeka contends that she was written up for arriving late to work when Ms.

Marsh Dobbs was not. (Complaint, Doc. 5, ¶¶ 15, 17) HealthSouth has presented

evidence that Ms. Umoeka was given a verbal warning on November 13, 1995, for being

more than an hour late two consecutive days -- November 6 and 7. Def. Exh. 2, Exh. 15.

This disciplinary write-up occurred more than 180 days before Ms. Umoeka filed her EEOC

charge. Therefore, any claim arising from this write-up is time-barred. 42 U.S.C. § 2000e-

5(e)(1).

Ms. Umoeka also contends that she was written up for being late to a call-back and

Ms. Marsh-Dobbs was never written up for being late to a call-back. Ms. Umoeka was

given a written warning for, among other things,[6] not arriving for call back until 1 ½ hours after she was called. Def. Exh. 2, Exh. 17. In the space on the form provided for the employee's comments, Ms. Umoeka wrote, "Taking [into] account the other studies the patient was scheduled for, I believed . . . the patient to be unavailable." *Id.* HealthSouth's policy requires employees to "respond within 15 minutes of the initial beep or call" requiring the employee to return to the hospital and employees must "arrive in the department within 30 minutes of response." Def. Exh. 2, Exh. 18. HealthSouth presented evidence that Mr. Lamon was not aware that Ms. Marsh-Dobbs had been "late to respond to a call-back," and he knew that she had never been as much as 1½ hours late. Def. Exh. 4, ¶ 54. Mr. Lamon also stated that he did not write up Ms. Umoeka *each* time she was late and he only disciplined her on this occassion because she was 1½ hours late. *Id.* Ms. Umoeka has not produced any evidence to dispute Mr. Lamon's testimony. Therefore, any discriminatory discipline claim arising from this write-up is due to be dismissed.

Ms. Umoeka contends that she was written up for having to repeat a procedure and Ms. Marsh-Dobbs, who had also repeated procedures, was not written up. On June 13, 1996, Ms. Umoeka recieved a second written warning, which stated she had "*failed to check images before [patients] left*," not that she was being given a warning because she had to repeat a procedure. Def. Exh. 2, Exh. 20 (emphasis added). Ms. Umoeka testified in her deposition that she had failed to check the images before releasing a patient. The images were inadequate and the patient had to be recalled to the department to take a

---

[6]Ms. Umoeka was also written up for being absent without calling in. Def. Exh. 2, Exh. 17.

second image. At this time, Mr. Lamon reminded Ms. Umoeka to review the images before releasing the patient. However, later that same day, Ms. Umoeka released another patient without reviewing the images; the images were inadequate and this second patient had to be recalled to repeat the procedure. In an affidavit submitted by HealthSouth, Ms. Marsh-Dobbs stated that she had never released a patient "without first having reviewed the image [she] prepared." Def. Exh. 7. Ms. Umoeka has failed to produce any evidence to rebut Ms. Marsh-Dobbs's sworn statement that she was not involved in the same conduct as Ms. Umoeka -- releasing a pateint without checking the image twice in one day and once after being reminded to always check the image before releasing a patient.

In addition to the foregoing, although not set forth with any particularity in Ms. Umoeka's Complaint or her Response to HealthSouth's Motion for Summary Judgment, Ms. Umoeka generally complains that she was written up for numerous things that Ms. Marsh-Dobbs was not, and that Ms. Marsh-Dobbs was not written up for other conduct that Ms. Umoeka thought inappropriate. A review of the record evidence shows that Ms. Umoeka has failed to establish that Ms. Marsh-Dobbs is similarly situated; the record does not contain any evidence that Ms. Marsh-Dobbs committed the same work rule violations that Ms. Umoeka admittedly committed. Moreover, the fact that Ms. Marsh-Dobbs was not written up for conduct Ms. Umoeka deems inappropriate -- such as calling Ms. Umoeka "stupid" and giving a patient the wrong medicine -- is not the basis of a separate claim of discrimination. Although it may be relevant evidence, the failure to write up Ms. Marsh-Dobbs simply does not constitute an adverse employment action prohibited by Title VII as to Ms. Umoeka.

Page 23 of 24

## CONCLUSION

For the reasons set forth above, the Court finds that there are no disputed issues of material fact and Summary Judgment in favor of Defendant is due to be granted as a matter of law. The Court will enter an Order contemporaneously herewith in accordance with this Memorandum of Opinion.

DONE this 26th day of May, 1999.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE